COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Callins and Frucci
Argued at Lexington, Virginia


BRANDY SMITH FUNDERBURG

                                                    MEMORANDUM OPINION* BY
v.          Record No. 0421-24-3          JUDGE DOMINIQUE A. CALLINS
                                                         JUNE 10, 2025

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Bruce D. Albertson, Judge

Brandy Smith Funderburg, *pro se*.

M. Victoria Shea, Assistant County Attorney; Kelsey Marker,
Guardian ad litem for the minor children (Rockingham County
Attorney's Office; Sellers Law Firm PLLC, on brief), for appellee.


Brandy Smith Funderburg ("mother"), *pro se*, appeals the circuit court's orders

adjudicating her minor children abused or neglected and ordering that custody of the children

remain with the Harrisonburg Rockingham Department of Social Services (the "Department").  On

appeal, mother challenges several of the circuit court's evidentiary rulings, and she argues that

the evidence did not support a finding of abuse and neglect.  Mother also contends that the circuit

court erred when it declined to place the children with their maternal grandmother.  For the

following reasons, we affirm the circuit court's judgment.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

At the time the Department first became involved, mother had four biological children:

12-year-old T.U., 11-year-old J.B., 7-year-old A.S., and 1-year-old Am.F.; Jesse Funderburg

("father") is the biological father of Am.F. and Au.F., mother's fifth child.[2]  Mother, her four oldest

children, father, and two of father's adult children resided in the same home in 2020.  On

Thanksgiving of that year, mother and father were arguing, and one of father's adult children,

Josephine, intervened.  When Josephine threatened to call the police, mother attempted to grab

Josephine's phone from her, "choked her, and then wrestled her to the ground while holding" Am.F.

Mother's older children witnessed this incident.

Police came to the house, "told all parties involved to calm down," and then left the

residence.  After the police left, the argument resumed and escalated until mother, while holding

Am.F., scratched father's face.  Police returned to the residence and arrested mother.  She was

charged with assault and battery, and father obtained a protective order.[3]  Father, his older biological

children, and Am.F. moved into a motel.

The Department investigated the incident, during which mother reported to a social worker

her "concerns" about father regarding "incestual or sexual abuse."  Mother also expressed concerns

that father was involved in a "Satanic, pedophile cult" with a former President of the United States

and reported that father visited adult websites.  Mother claimed that she homeschooled the children

---

[1] "On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).  "To the extent that this opinion discusses facts found in sealed documents in the record, we unseal only those facts." *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

[2] We use initials in an attempt to protect the privacy of the minor children.  Additionally, Au.F. was not born until 2021, after the Department first became involved.

[3] Both the assault and battery charge and protective order were dismissed.

and that her oldest child, T.U., was autistic.  Mother explained that the children had attended public school, but that the school did not have adequate resources for T.U.

The older children reported that mother and father often fought in the home.  Months before the Thanksgiving incident, mother had "pointed a gun at Josephine and the police were called," but she was not arrested.  On another occasion, mother, with Am.F. inside her car, drove her car into father's car because she was angry.  Father told the Department that mother had an "undiagnosed narcissistic personality disorder, which cause[d] her to act dangerously and sporadically."  Father explained that mother "believed people were following her and Satanists were casting spells on her at the grocery store."

A few weeks after Thanksgiving, mother informed the Department that Am.F. was in her care because father had dropped the protective order.  Mother told the Department that when the child returned, the child's "genital area was red and that [the child] was touching it," and asked the Department to investigate father for sexual abuse.  The Department provided mother education on the "various reasons why [the child's] genital area could be red, and that it is age-appropriate for children to touch this area at times."  The Department advised mother to take the child to a pediatrician if she suspected sexual abuse.

One month later, mother "got upset with [father] because he had said he wanted a divorce, and she began calling him a pedophile and took the child to the hospital for an evaluation."  Mother took Am.F. to the emergency room; the doctor examined the child for "concern for sexual assault reported by mother.  Infant [was] alert, well appearing with no signs of recent physical or sexual trauma."  Hospital personnel reported that "Mother ha[d] rapid speech, tangential and paranoid ideas," and the medical records expressed concern for the child's well-being.

The Department then opened a service case on the family due to mental health concerns and the history of discord between mother and father.  The Department provided mother and father with

counseling, psychological evaluations, an evaluation for T.U., and a referral to infant and toddler connection. After mother's psychological evaluation was scheduled, she informed the Department that she and father planned to move to West Virginia. The Department then closed the family assessment case before mother's psychological evaluations could be completed.

Mother did not move to West Virginia, and in 2022, the Department opened another assessment for inadequate supervision after receiving a report that mother and father were involved in a "car chase" while Am.F. and Au.F. were in mother's car. The Department learned that "there [were] approximately 22 911 calls between the parties over a six-month period." In many of the calls, father requested a wellness-check on mother and the children.

As a part of its services case, the Department conducted a recorded family partnership meeting with mother and father. During the meeting, mother claimed that father had assaulted her several times. Mother also claimed that the FBI had deemed father a sociopath, and mother accused father of watching "teenage pornography" and molesting Am.F.

After the family partnership meeting, a Department employee witnessed mother and father arguing in the parking lot. While holding Au.F., mother screamed at father, "flip[ed] him off," and behaved erratically. The other children were also standing near mother. The Department employee instructed mother and father to go their separate ways.

The Department filed preliminary child protective orders. When the social worker visited mother's home to inform her, only T.U. and J.B. were present; both appeared "dirty" and were wearing stained clothing. When the social worker returned later that day, she observed "totes, rugs, stuffed animals in bags," piled on the porch. The inside of the home was "completely dirty," with dishes piled in the sink and old food on the stove. J.B. and A.S. were in their room, which "smelled like animal urine and animal feces," with "a puddle [of urine] right underneath of the window." Mother stated that she, father, and the children were once again planning to move to West Virginia.

The Department filed emergency petitions for preliminary child protective orders to prevent the family from leaving the jurisdiction. The Rockingham County Juvenile and Domestic Relations District Court ("JDR court") amended the petition to permit emergency removal, finding there was "no less restrictive alternative." The JDR court adjudicated the children abused or neglected and placed the children in the Department's custody in September 2022. Mother appealed to the circuit court.

During the hearing on mother's appeal, the circuit court heard the recording of the family partnership meeting. Father then testified that mother regularly smoked marijuana and that she was "high most of the time, which made [their] daily life dysfunctional." He also stated that mother drove under the influence of marijuana while the children were in the car. Father further testified that he and mother argued often in the children's presence, and father had called the police to deescalate the situation. These arguments involved "[y]elling, breaking things, breaking TVs, breaking windows, ramming cars into cars, smoking more pot in between sessions of arguing." Mother threw silverware and broke dishes. The children were "running around" on broken glass and were subjected to mother's anger on "a continual basis." According to father, on several occasions, mother used her car to hit father's car while the children were with her. Mother struck father, had used a baseball bat to "beat TVs," and "beat the windshield out of a truck."

Father described mother's home as "completely filthy" in conditions "completely unacceptable for raising children." Mother kept stray cats in the home that "constantly" scratched Am.F. The animals urinated and defecated in the house. Father witnessed the younger children "playing with piles of dog poop" several times. The younger children played with rabbits in their bedroom; the animals used "the bathroom all over their clothes and in their bedding, and it would stay there."

Father also testified that mother resisted taking the children to the doctor when treatment was needed. Father testified that mother had a "great deal of paranoia and anxiety"; she claimed she was being followed and was having Satanic spells cast on her. Father denied mother's allegations that he had been involved in a Satanic or illegal sex group.

Mother denied that there was ever "animal feces around the house." Mother had a prescription for marijuana for PTSD treatment, but she denied using marijuana in front of the children and alleged she used it "lightly in the evening after, like, a long day." Mother acknowledged fighting with father, and breaking a TV on one occasion, but denied that it occurred in the children's presence. Mother also claimed that she had accidentally "dinged" father's car once.

At the close of evidence, the circuit court adjudicated the children abused or neglected. Crediting the Department's evidence and father's testimony, the circuit court found "that the parties were in a cycle of abusive behavior towards each other. They did this in front of the children." The circuit court emphasized that father's testimony was supported by other evidence, including damage to his truck and the social worker's report about the condition of mother's house. After considering the recorded family partnership meeting, the circuit court found that it showed mother was "dealing with some sort of psychosis, whether it was drug-induced or whether it was some other mental health issue."

The parties later reconvened for a dispositional hearing.[4] Mother asked the circuit court to order the children to return home; alternatively, she requested that the court place the children with

---

[4] At the time of the hearing, the Department had custody of the children, but Am.F. and Au.F. resided with father, as "unsupervised visitation." The three older children resided in a foster home.

- 6 -

the maternal grandmother, Carolyn Smith ("grandmother"), if the circuit court did not permit the children to return home with mother.[5]

After the children's removal, mother contacted the Department, accused father of being involved with the mafia, and threatened violence against Department employees. Although mother had been receiving counseling, the Department was not "able to work in a collaborative manner with [the] provider" to acquire releases and review mother's records.

Mother began working with a parent mentor, and the Department received positive reports from mother's sessions. The foster care case manager opined that mother's parenting barriers involved a "lack of knowledge about where [she was] with her mental health treatment and her services." But mother had improved in her visitations with the children, which was "a really good starting point to get . . . in the right direction."

Dr. Logan Rowe, a licensed clinical psychologist, completed psychological and parent capacity evaluations for mother. Dr. Rowe diagnosed mother with bipolar disorder, "with her most recent episode being manic." He recommended that mother receive "psychiatric treatment to stabilize [her] clinical condition" and improve "her ability to parent effectively." Dr. Rowe recommended that mother take medication and refrain from substance use. He was unable to evaluate mother's "parenting capacity at her clinical baseline, as her current functioning [was] so impaired by her current manic episode," but he expressed "little optimism that [mother and father] will be able to effectively co-parent their children without formal intervention."

Dr. Rebecca Plesko-Dubois evaluated mother to determine whether she presented with autism spectrum disorder. Following the evaluation, Dr. Plesko-Dubois diagnosed mother with autism and ADHD. Dr. Plesko-Dubois recommended that mother receive consistent support for

---

[5] Grandmother had filed a petition for custody of all five children in the JDR court.

"her mental health and executive functioning, as well as new support designed for adults with autism spectrum disorder."

Dr. Preska Moore, a clinical psychiatrist, had treated mother for her mental health for approximately eight months before the hearing and diagnosed mother with ADHD. Dr. Moore asserted that mother had improved with medication and that she seemed more calm and less anxious. Dr. Moore doubted mother's diagnosis for bipolar disorder, but she testified that mother was taking medication for the condition.

Judith Weaver, a licensed professional counselor, completed an intake evaluation of mother on behalf of the Department. Weaver observed that mother displayed "manic symptoms" and had an "obsessive focus on [father's] behavior." Weaver recommended mother see a psychiatrist for treatment. Mother began a Batterers' Intervention program with Weaver but had not completed it at the time of the hearing.

Dr. Carla S. Galusha also performed a psychological and parenting evaluation of mother. Mother informed Dr. Galusha that she and father "ended their highly unhealthy relationship," and Dr. Galusha recommended that mother and father "have as little contact as possible." Dr. Galusha opined that mother had done her best to comply with the Department's recommendations and that she was "amenable to placing the children in schools outside the home. She has supportive parents and family members who are willing to provide emotional and financial support." Dr. Galusha concluded that mother appeared to "hold positive attachment towards her children. She is motivated to provide a healthy, stable environment."

The Department considered grandmother as a relative placement, but had concerns about mother's claim that grandmother was an alcoholic. Grandmother informed the Department that she was aware of the "chaos" between mother and father, but did not want to be involved. Grandmother had a hard time setting boundaries with mother, declined to intervene when mother behaved

erratically in the children's presence, and could not clearly describe to the Department how she would ensure the children's safety, especially if mother was ordered to have no contact with the children. Grandmother communicated that she felt the children's fathers were "dangerous" and the Department was concerned that she would not facilitate visitations between the children and the fathers. Grandmother stated that she worked approximately 60 to 80 hours a week, and that "a day nanny and a night nanny [would] care for the children, and that the three oldest would go to a boarding school."

Grandmother testified that she lived in a five-bedroom home. She acknowledged that she had alcohol in her home, but testified that she only drank on social occasions, and she could lock up the alcohol in her home while the children were there. Grandmother stated that she intended to care for the children in her home and would involve mother to the extent permitted by the circuit court's order. Following the children's removal, grandmother had visited the children approximately once a month. As of the date of the hearing, grandmother had never had all five children in her home; the children indicated that they did not have a close relationship with her.

After considering the totality of the evidence, the circuit court declined to return the children to mother or place them with grandmother. In ordering that custody of the children remain with the Department, the circuit court rejected mother's testimony and found that domestic violence had occurred regularly in the home. The circuit court also found that in mother's testimony, "[e]very response includes some information, but it also includes a dagger towards one or all of the fathers, or a dagger towards" the Department. Based on the medical evidence presented, the circuit court found that mother presented with autism, ADHD, and bipolar disorder. Noting that mother was "selective" about the treatment information she shared with the Department, the circuit court held that it appeared that mother was "not receiving sufficient treatment" as of the date of the hearing. The circuit court acknowledged that its conclusion could change with additional evidence presented

- 9 -

at future proceedings, and it ordered that the foster care goal remain return home or relative placement.

After the hearing, the circuit court entered final orders adjudicating the children abused or neglected. It also entered dispositional orders maintaining the Department's custody of the children and approving its foster care plan with the goal of return home and a concurrent goal of relative placement. Mother now appeals to this Court.

ANALYSIS

I. Abuse and Neglect

Mother asserts eight assignments of error.[6] In her first, mother contends the evidence proved that she was not a "mental danger" to the children. Therefore, she argues the circuit court erred by ruling that the children were abused or neglected because such ruling "deviates from the facts of the case and presented evidence." We disagree.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (alteration in original) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). When "the record contains credible evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the trial court." *Bedell v. Price*, 70 Va. App. 497, 504 (2019) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 336 (1992)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to

---

[6] Mother officially asserts eight assignments of error, but in her opening brief she designates two separate assignments of error as "assignment of error 3." In her first "third" assignment of error, mother challenges the court's credibility determination of father. In her second "third" assignment of error, mother contends that "new evidence has come to light" of perjury and that a new trial should be granted. Both are addressed, *infra*.

support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Courts have the authority to remove a child from a parent's custody when the child is alleged to have been abused or neglected. Code §§ 16.1-251 (providing for emergency removal orders), -252 (providing for preliminary removal orders). The Department may intervene "where 'the child would be subject to an imminent threat to life or health to the extent that severe or irreversible injury would be likely to result if the child were returned to or left in the custody of his parent.'" *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 342, 364 (2012) (quoting *Jenkins v. Winchester Dep't of Soc. Servs.*, 12 Va. App. 1178, 1183 (1991)).

An abused or neglected child is any child "[w]hose parents . . . create[] or inflict[], threaten[] to create or inflict, or allow[] to be created or inflicted upon such child a physical or mental injury by other than accidental means, or create[] a substantial risk of death, disfigurement or impairment of bodily or mental functions." Code § 16.1-228(1). "[T]he statutory definitions of an abused or neglected child do not require proof of actual harm or impairment having been experienced by the child." *Farrell*, 59 Va. App. at 364 (alteration in original) (quoting *Jenkins*, 12 Va. App. at 1183). Circuit courts make abuse and neglect findings on a preponderance of the evidence standard, *Cumbo v. Dickenson Cnty. Dep't of Soc. Servs.*, 62 Va. App. 124, 130 (2013), and a reviewing court evaluates an abuse and neglect finding for an abuse of discretion, *see Farrell*, 59 Va. App. at 362-65.

The record supports the circuit court's finding that the children were abused or neglected and that mother presented a danger to the children. The circuit court heard evidence of violence and destruction of property between mother and father in the children's presence. Indeed, father testified that mother would "pull out baseball bats" and, at least once, she smashed a TV and the windshield of a truck. Mother also engaged in physical altercations while holding the children and

intentionally hit father's car while the children were in her car. Additionally, mother scratched father's face and "ripped off" his shirt more than once, and father testified that mother threw silverware and broke dishes. This behavior resulted in 22 9-1-1 phone calls during a six-month period.

The circuit court heard evidence of mother's marijuana use in the children's presence, including while driving with the children in her vehicle. The poor condition of the home also put the children at substantial risk. A social worker testified that various totes, rugs, stuffed animals in bags, garbage bags, and other materials piled more than 5'5" high on the front porch, proving a danger to smaller children. Further, evidence demonstrated the presence of old food and animal excrement in the home.

The circuit court also heard evidence of mother's mental health diagnoses. Mother claimed that father was engaged in a sex cult with a former President of the United States and subjected her daughter to sexual examinations, believing that father had sexually abused her daughter. The hospital personnel reported that "Mother ha[d] rapid speech, tangential and paranoid ideas," and the medical records expressed concern for the child's well-being. Prior to the hearing, mother was diagnosed with bipolar disorder, autism, and ADHD, and the circuit court likewise found that mother presented with these diagnoses. The circuit court also considered mother's treatment and concluded that mother was "not receiving sufficient treatment" as of the date of the hearing.

Based on the record evidence of domestic violence, drug use, the condition of the home, and mother's diagnoses, we cannot hold that the circuit court abused its discretion in finding that the children would have been at substantial risk of harm if returned to mother's care.[7] Code § 16.1-228(1).

---

[7] Mother's second assignment of error alleges that the circuit court erred in ruling that "[t]he Department met the burden of proof." Because mother's first and second assignments of

- 12 -

## II. Father's Credibility

In her third assignment of error, mother argues that the circuit court erred by crediting father's testimony given his "serious personality disorder, predisposition to criminality, manipulation," and other alleged traits.

The "credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Harvey v. Flockhart*, 65 Va. App. 131, 146 (2015)). "The living record contains many guideposts to the truth which are not in the printed record; not having seen [the witnesses] ourselves, we should give great weight to the conclusions of those who have seen and heard them." *Dean v. Morris*, 287 Va. 531, 537 (2014) (alteration in original) (quoting *Fred C. Walker Agency, Inc. v. Lucas*, 215 Va. 535, 541 (1975)). "This Court is bound by the credibility findings of the circuit court." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 339 (2013).

Here, the record reflects that the circuit court was within its discretion when it weighed father's credibility. While discussing the possibility of firearms in the home, the circuit court repeatedly noted father's status as a convicted felon. Nothing in the record indicates that the circuit court *ignored* father's past crime or his diagnosed personality disorder, as mother contends. Because "the credibility of witnesses is quintessentially a matter for the [factfinder] to resolve," we cannot say that the court abused its discretion in finding father's testimony credible. *Colas v. Tyree*, 302 Va. 17, 30 (2023).

---

error challenge the circuit court's finding of abuse and neglect, these assignments are both addressed within this section.

### III.  Placement with Grandmother

In mother's fifth assignment of error, she challenges the circuit court's finding that grandmother was not a viable custodian option, contending that grandmother was well-equipped to care for the children.  As noted, we presume that the circuit court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Logan*, 13 Va. App. at 128 (quoting *Farley v. Farley*, 9 Va. App. 326, 329 (1990)).

On this record, we find no error in the circuit court's finding that grandmother was not a viable alternative custodian for the children.  Although grandmother had sufficient financial resources, she worked up to 80 hours a week, limiting her availability to meet the children's needs.  Grandmother also testified that a day nanny and night nanny would be the children's primary caretakers.  Alcohol was present in the home, and mother had claimed that grandmother was an alcoholic.  Tellingly, although grandmother was aware of the "chaos" in mother and father's relationship, she chose not to get involved to assist the children.  As of the date of the hearing, grandmother had never had all five children in her home, and the children indicated that they did not have a close relationship with her.  Grandmother also acknowledged that she had trouble setting boundaries with mother, so the Department was concerned that she would not enforce any restrictions on mother's interaction with the children.  Considering these facts, we cannot say that the circuit court erred in declining to place the children with grandmother at the time of its decision.

### IV.  Waiver

Mother argues on brief that new evidence demonstrates that "the Department, Guardian ad Litem, [and] Mr. Funderburg commit[ted] perjury[,] and a new trial sh[ould] be granted."[8]

---

[8] In addition to mother's failure to preserve this argument in accordance with Rule 5A:18, the argument is not encompassed in mother's assignments of error.  *See* Rule 5A:20(c) (requiring an opening brief to list "the specific errors in the rulings below").  Further, mother provides no legal authorities on brief relating to perjury.  *See* Rule 5A:20(e) (requiring that an opening brief

She also contends, in her fourth and fifth assignments of error, that her "children were not granted due process" because the circuit court failed to allow the children to testify and that the court erroneously failed to consider the Family First Prevention Services Act.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of Rule 5A:18 is 'to ensure that the trial court and opposing party are given the opportunity to intelligently address, examine, and resolve issues in the trial court, thus avoiding unnecessary appeals.'" *Friedman v. Smith*, 68 Va. App. 529, 544 (2018) (quoting *Andrews v. Commonwealth*, 37 Va. App. 479, 493 (2002)). "Specificity and timeliness undergird the contemporaneous-objection rule[ and] animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

Mother raises the issues of perjury, lack of due process for her children, and disregard of the Family First Prevention Services Act for the first time on appeal. As is long-established, a *pro se* litigant "is no less bound by the rules of procedure and substantive law than a [litigant] represented by counsel." *Townes v. Commonwealth*, 234 Va. 307, 319 (1987) (quoting *Church v. Commonwealth*, 230 Va. 208, 213 (1985)). Stated differently, "[t]he 'right of self-representation is not a license' to fail 'to comply with the relevant rules of procedural and substantive law.'" *Francis v. Francis*, 30 Va. App. 584, 591 (1999) (quoting *Townes*, 234 Va. at

contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error").

- 15 -

319).  Indeed, she challenges the circuit court's finding considering "new evidence [that] has come to light," the circuit court's failure to allow her children to participate, and the court's weighing of the law, but she did not make these arguments to the circuit court.  Thus, she may not raise them for the first time on appeal.  Rule 5A:18.  Additionally, mother has "not invoked either exception to Rule 5A:18, and we do not consider them *sua sponte*."  *Spanos v. Taylor*, 76 Va. App. 810, 827-28 (2023).[9]  Therefore, we do not reach these assignments of error that mother has failed to preserve for appeal.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

---

[9] In mother's assignments of error seven and eight, she contends that the circuit court erred by allowing the Department to admit into evidence a recording and limiting mother's testimony to 15 minutes.  In mother's reply brief, however, she "concede[s]" these assignments of error and "withdraw[s] th[ese] claims."  Accordingly, we do not address them.